UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

MICHAEL J. MASTOVITO,                          Case No. 07-59798-WS
SUZANNE E. MASTROVITO,                          Chapter 7

          Debtors.
_____/

## OPINION GRANTING UNITED STATES TRUSTEE'S MOTION TO DISMISS

### I.  Introduction

Before the Court is the United States Trustee's ("UST") Motion to Dismiss Under 11 U.S.C.

§ 707(b)(3) this chapter 7 case which was filed October 2, 2007.[1]  The issue under § 707(b)(3)

(where the presumption of abuse does not exist or has been rebutted) is whether the totality of the

circumstances demonstrate abuse.  There are no material factual disputes.

### II.  Facts

Michael and Suzanne Mastrovito (the "Debtors") have been married approximately eight

years.  For the past nine years, Mr. Mastrovito has been employed as the operator of construction

cranes, lifting and moving steel utilized in the construction of various buildings.  The Debtors have

an 8 year-old daughter.  Mrs. Mastrovito is employed as an administrative assistant at a local

college.  About two years prior to consulting an attorney with regard to possible bankruptcy, Debtors

sought the assistance of a credit counseling service or agency with which they entered into an

arrangement whereby they paid in some $1500 per month from which the agency took a small fee

---

1.      The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"),
Publ. L. No. 109-8, § 102(a) (2005), became effective in cases filed on or after October 17, 2005.
All code section references are to Title 11 as amended by BAPCPA.

and remitted to the rest to Debtors' then creditors. That arrangement lasted approximately a year, ending with Debtors' inability to keep up their monthly payments. They then turned to a debt repayment entity. It required monthly payments of some $600 or so per month, out of which that entity took a very large fee. After a number of months with that entity, Debtors ascertained that no (or minimal) payments were being made to their creditors. They then filed for relief under chapter 7 of the Bankruptcy Code. They have twice amended their Schedules I & J.

The UST filed this Motion based entirely on the argument that some of Debtors' initially filed Schedule J expenses were inappropriate or overstated to the point that if more properly stated they would show sufficient income to fund a chapter 13 plan - thus permitting a finding of abuse. The Debtors' Amended Schedule I showed monthly income of $5,553.67. Amended Schedule J shows monthly expenses of $5,366.00. At the evidentiary hearing, the Debtors testified to slight adjustments in Schedule I, namely: (a) on Debtor's line 4c, the union dues listed as $151.67 are already factored into the vacation fund found on line 4d, and thus should read $0; and (b) the spouse no longer earns the income listed on line 7, thus the $125 should read $0. These changes bring the monthly income to $5,580.34. The listed monthly expenses the UST takes issue with are (a) the transportation expense with Debtor retaining both a truck and a motorcycle (for what Debtors say is for its fuel saving capability); and (b) the overall generousness of the schedule, including the mortgage and the food estimate. Moreover, the UST argues that in any event (without any of the argued for adjustments which would produce an even greater amount for creditors), the current schedules, as they stand, produce a $187 surplus per month to pay into a chapter 13 plan, which, projected over 60 months, would result in repayment of approximately 13% of the unsecured debt.[2] Debtors have primarily consumer debts totaling $83,197.32.

_____

2.     Taking into account the slight changes to Schedule I which Debtors testified to at the hearing, there would be a monthly surplus of $214 which, put towards a 60 month plan, would result in a 15% dividend to unsecured creditors.

## III. Discussion

Authority to dismiss a case under chapter 7 is derived from 11 U.S.C. § 707(b)(1), which provides in part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1). In those cases where the presumption of abuse does not arise, as here, or is otherwise rebutted, and where bad faith is not a factor, the Court is directed to consider the totality of the circumstances in determining whether dismissal for abuse is warranted. 11 U.S.C. § 707(b)(3)(B). The UST carries the burden of establishing by a preponderance of the evidence the applicability of this ground for dismissal.

## A. Ability to Pay

In the Sixth Circuit, a totality of the circumstances inquiry under § 707(b)(3)(B) involves an analysis of whether the debtor is honest or needy. *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *Behlke v. Eisen* (*In re Behlke*), 358 F.3d 429, 434 (6th Cir. 2004). Either factor, or both, may provide sufficient justification for dismissal for abuse. The UST relies primarily on language in *Krohn* that states that where debtors have the ability to repay a meaningful portion of their debts from future earnings their chapter 7 filing should be dismissed as an abuse. *Krohn*, 886 F.2d at 126. In *Krohn*, and later in *Behlke*, the Sixth Circuit opined that a debtor's ability to repay his debts out of future earnings may alone justify dismissal for abuse, or more precisely, that "the ability to pay may be but is not necessarily sufficient to warrant dismissal" for abuse. *Behlke*, 358 F.3d at 434-35; *Krohn*, 886 F.2d at 126. This Court has on several occasions reviewed the decisions in *Krohn* and

3

*Behlke* and has interpreted those opinions as follows: the sheer mathematical ability to fund a chapter 13 plan can, and properly should, be considered and weighed as but one factor (though an important one) within a totality of the circumstances analysis. See, e.g., *In re Shelby*, No. 06-48745 (Bankr. E.D. Mich. July 25, 2007) and *In re Beckerman*, No. 06-49172 (Bankr. E.D. Mich. February 4, 2008). If, after considering all of the relevant circumstances, equitable considerations favor dismissing the chapter 7 case based upon a debtor's ability to pay, it is within the Court's discretion to do so. Artificially limiting the Court's examination of a debtor's financial circumstances to one factor and one factor alone, the debtor's ability to repay debts out of future earnings, is at odds with the totality of the circumstances inquiry mandated by Congress and with the message of *Krohn*, which itself observed that the ability to repay debts was "[a]mong the factors to be considered in deciding whether a debtor is needy . . . ." *Krohn* 886 F.2d at 126.

Whether a debtor is sufficiently "needy" to justify the relief sought under chapter 7 is determined by an examination of the following non-exclusive factors: (a) whether the debtor has the ability to repay his debts out of future earnings; (b) whether the debtor enjoys a stable source of future income; (c) whether the debtor is eligible for chapter 13 relief; (d) whether there are state remedies with the potential to ease the debtor's financial predicament; (e) whether relief may be obtained through private negotiations with creditors; and (f) whether expenses can be reduced significantly without depriving the debtor of adequate food, clothing, shelter and other necessities. *In re Krohn,* 886 F. 2d at 126-27. One consideration relevant to the first factor, whether the debtor has the ability to repay debts, is whether the debtor has sufficient disposable income to fund a hypothetical chapter 13 plan. *Behlke*, 358 F.3d at 435.

### 1. Debtors' Ability to Repay Debts out of Future Earnings

According to Debtors' Amended Schedules I and J, they currently have a surplus of $187.67. Debtors both testified to changes in the schedules of $151.67 for union dues which are already

factored into Debtors' vacation fund and thus should be included back into the income and a subtraction from the income of $125.00 as Mrs. Mastrovito no longer earns the income listed on line 7 of Amended Schedule J. The upshot of these changes leaves a surplus income availability of $214.34, which, over the course of a 5 year chapter 13 plan, would yield $12,860.40 for creditors. This amount represents 15% of Debtors outstanding obligations without accounting for the possible expense reductions which could increase these results.

## 2. Reduction of Expenses

A review of the Debtors' Schedules show that their expenses are reducible and that additional belt tightening is not out of the question. First, the transportation expense, car insurance and the car payments combined total $1,331.00. The UST argues that the benefit of owning a new motorcycle cannot make up for the expense. Debtor testified that he owns a Dodge Ram truck necessary for hauling tools used in his employment and that, unlike *In re Graham*, 363 B.R. 844 (S.D. Ohio 2007), where the motorcycle was used to supplement a truck that had 160 thousand miles on it and was in poor condition, here Debtor testified that he owns and uses his Harley motorcycle strictly to save money on gas. Debtor stated that he takes his motorcycle to work approximately twice a week during warm weather months and that his motorcycle averages 58-60 miles per gallon. Debtor testified that his truck averages 19 miles per gallon and that between the 2 vehicles he drives 35,000 to 40,000 miles per year. If Debtor were to ride his motorcycle to work two days per week throughout the year (which clearly is not the case during the winter months), and all of the 35,000 to 40,000 miles were driven during the work week, Debtor would travel in the neighborhood of 15,000 miles a year on the motorcycle. Putting the cost of gasoline at a liberal $5.00 per gallon, the difference saved per month in using the motorcycle over the truck is $225. However, the expense of the motorcycle payment and insurance per month is $447. Thus, there is a deficit of $222 per month for use of the motorcycle that could be put back into Debtors' budget. In this case, the

motorcycle should be viewed as would the ownership of a second, more economical vehicle, the use of which, while affording tangible and intangible benefits to the Debtor, can, and should, be dispensed with in the context of a belt tightening obligation that can be effected without serious adverse affect on Debtors.

The UST argues that the Debtors' expenses can be reduced for food as the $650 is a bit heavy, housing budget as the Debtors have a second mortgage, and home heating costs at $400 a month was high for an average. Schedule J is a statement of current expenditures and should reflect actual expenses of the Debtors. 11 U.S.C. § 521(a)(1)(B)(ii).

Taking the foregoing into account, the facts of this case indicate that (1) Debtors have the ability to repay debt through future earnings, and (2) they should be able to significantly reduce certain expenses without depriving themselves of food, clothing, shelter or other necessities.

As this Court has said on occasion, while the § 707(b)(3) analysis is not purely a numbers game, the ability to fund a chapter 13 plan is possibly the most important single consideration. The Court is not unmindful that the Debtors in this case demonstrated pre-petition their interest in paying their creditors in some sort of structured way. That demonstrates essentially two things at the same time: (1) a sincere desire to pay creditors, and (2) the availability of some means (income) to do so. The real problem with their earlier arrangements was that the level of payments they voluntarily entered into exceeded their ability to pay; and, in their last arrangement, Debtors were in essence victimized by the excessive fees charged them.

It is somewhat unfortunate that the drafters of the applicable statute felt compelled to use the term "abuse" to describe situations like this one where debtors otherwise acting in seeming good faith have the means and likely the desire to at least attempt to pay their creditors. This particular case is a close call, but on balance the Court concludes that the Debtors ought to be required to be given the option to at least attempt some sort of feasible chapter 13 plan that is more consistent with

their current means than their pre-petition efforts. In this connection, it should be noted that the numbers the Court has used in its analysis should not be taken as defining those that should be considered as the parameters or numbers defining a feasible plan. They only actually illustrate a potential sufficient to reach the indicated result. The Debtors actual and reasonably predictable income and expenses at the time they propose a plan must be what determine the confirmability of any proposed plan.

For the foregoing reasons, the UST's Motion to Dismiss pursuant to § 707(b) is granted unless, within 20 days from the entry of the order effectuating the Opinion, the Debtors convert to a chapter 13 proceeding. The UST shall present an appropriate order.

**Signed on October 14, 2008**

**/s/ Walter Shapero**
**Walter Shapero**
**United States Bankruptcy Judge**